The next matter is Todd Cox and Mary Dinsick v. Blackberry. Thank you. Good morning, Your Honor, as it pleases the Court. David Brower for the Plaintiffs. Good morning. Why don't we start where Judge Grisei wound up and talk about Santer? Okay. The issue of Santer is, as you know, we attempted to file an amended complaint. And the Court refused it, which is our main argument on this appeal, that we should be allowed to amend. With respect to the question of Santer, the clearest mistake that Judge Grisei made was from the very language he uses, this fact alone, this by itself, this by itself, this fact alone, which were a series of pieces of evidence to show that we met the Santer requirement, some of which have been found standing alone to be sufficient to meet the Santer requirement. He considered them in isolation. That violates the standards set forth by the United States Supreme Court Intellect. You have to put them all together on a scale. He didn't do so. Importantly, I'll give you one example. He looked at the fact that we alleged these defendants, these individual defendants, were desperate that this product be viewed by the marketplace as successful. That fact is something that was—the fact that they were desperate was well known in the marketplace. Correct. And that their jobs depended on it. Now, typically, I will admit, most courts have said the fact that you might lose your job or your desire to hold on to your job is not enough to show Santer. However, we have a situation here that other courts have said is different. And the situation here was, one, they were desperate. Two, their predecessors, immediate predecessors, were fired over the failed launch of another product. Finally, when this product failed, and indeed it failed, there's no question about that, once again, these gentlemen were fired. Where you have a situation where your predecessor is fired, where you expect to be fired if something fails, and you are indeed fired when it fails, that shows a conscious state of mind, a kind of motive, that is more than the simple everybody likes to keep their jobs, everybody wants their salary. But let me move on to the question of the amendment. Each of your honors has written opinions dealing with leave to amend complaints in complex securities cases, and each of you have been part of panels that have allowed amendments on various different complicated fact patterns. I submit here that not only do you have all of the situations that were in those cases that are cited in briefs and you ruled on, but they're all present here. And I'll give you an example. In FIGAS, which of course was Judge Pooler's decision, what happened there was the district court decided the motion to dismiss found essentially that there was no such thing as an opinion cause of action, dismissed the case. After the dismissal of the case, fate versus regents was decided by this court, which found there is a cause of action for an opinion, but you had to show that the defendant subjectively disbelieved the opinion. That was a test, and the case was remanded for an amended complaint to deal with the new standards set by the Second Circuit. As it would happen, the case was dismissed again by the district court on the amended complaint, sent back to this court, this court affirmed under the fate decision, and then the case was sitting in front of the Supreme Court on search when the Supreme Court decided omnicare. A week after it decided omnicare, where it rejected the concept that you were required to show the defendant subjectively disbelieved his or her opinion, the court also said, we're remanding fetus back to the Second Circuit, back to the district court in light of our omnicare decision, because fate was no longer the law. Here, omnicare was decided after Judge Grisey issued his decision on the motion to dismiss. In his motion to dismiss, he relied entirely for almost every decision on every alleged misrepresentation and omission, as well as for every question of scienter on fate. If you look at the opinion, his counterbalancing, more compelling findings for each and every one of the arguments that we made, for each and every one of the allegations of false and misleading statements, other than 303, which I'll get to, was based on there's no reason to believe defendants didn't honestly believe that. That this wasn't honestly their opinion. That this wasn't their opinion. That they didn't believe it. That this wasn't their belief. Every single decision on every allegation of complaint, other than the 303 allegations, were based on the court's use of fate and the failure to show the defendants subjectively disbelieved their opinion. Again, that's no longer the law. We went to Judge Grisey and said, this is no longer the law. Judge Grisey didn't care and would not allow an amended complaint, would not reconsider his opinion in light of the omnicare decision and the fact that fetus had been sent back, vacated and remanded. And he would not allow an amended complaint. In addition. Don't we have to distinguish what opinions we're talking about? To the extent that the statements from the company are largely that this is a good product and it's going to take the market by storm. Those weren't the opinions. Those aren't the opinions. The opinions in this case are the product is selling well. The product has been accepted by the public. We're up to we're doing exactly how we've projected we're going to do. And your honor, you know, isn't that the question of we're doing as well as we projected we were going to do? What is in the complaint about what their projections were? What we put in what we have added to the complaint is we have statements that show the information that was in an article that came out during the class period. And it's very important. Oracle came out during the class period that said they're not doing well. Returns are outstripping sales. The product is a complete failure. The debt Weiler Fenton. Correct. This is this is what the whole case is to me about. And most of the other stuff I would I wouldn't give you the time of day if it weren't for that that report. And there we're seeing something that's a little bit different, especially in light of what we now know, which is that that report was, in fact, factually accurate. That's what you that's what you want to do. That's what you want to amend. Absolutely correct. And I might say, keep in mind, one of one of the cases I've cited on rebuttal, if I get any now, talked about one of the most important evidence of scienter is an affirmative misrepresentation proves to be wrong. And they cite matrix in matrix Supreme Court's decision matrix. What compelled Judge Sotomayor to find scienter there was the fact that the defendants denied vehemently an article that accused them of exactly what turned out to be the case. That's exactly what happened here with the debt Weiler article. The defendants, after it came out, vehemently denied it was correct and undermined it in every way. And, of course, it was nine hundred fifty million dollars. Correct. At the end of the day. I don't know how much time I have left. You have reserved three minutes, sir, but I'll let you keep it. Thank you, Your Honor. Thank you. Good morning. May it please the Court. Dan Warmilevsky on behalf of BlackBerry. Let me go right to the debt Weiler report and the Dunham prosecution and why the, quote, in discussing the debt Weiler report. And this is before we know anything about debt Weiler says about the 6K issued on April 12, 2013, that a more compelling inference can be drawn that defendants had sincere confidence in the accuracy of their internal metrics showing that sales of the devices were meeting forecast. The April 12, 2013 6K has four factual statements. Well, putting aside the 6K, what about the press release that they issued that said the debt Weiler report is not just wrong, it's a fraud. These people are deliberately trying to undermine our stock price, and they're saying false things. Of course. Investigation. Yeah. We now know that they were saying accurate things. We do not. We do not. It's not accurate. It is not accurate. None of that was not accurate. But I'm sorry. By 6K, I mean the press release. Yeah. So tell me why the information in the criminal complaint does not make a plausible case that – first of all, I'm putting aside Santa for the moment – that factually one of the major retailers had data showing exactly what the report says. It doesn't say anything. Debt Weiler talks about, quote, several retail partners. Mr. Dunham worked for an indirect exclusive reseller for Verizon Wireless that had information concerning 400 stores. There are thousands and thousands and thousands of outlets that sell BlackBerry devices. BlackBerry devices are sold online at Verizon. They are sold in Verizon stores. They're sold in any number of stores. We know that when BlackBerry reacted – BlackBerry gets the report 8.41 in the morning. It goes on the wire that Z10 returns said to outnumber sales at Verizon. So what do we know from the press release that BlackBerry does in response? They call up Debt Weiler and they say, can we get a copy of your report? What's it based on? Debt Weiler refuses. They then go out and they collect data from retail and carrier partners about return rates. BlackBerry doesn't have access to return rates. BlackBerry, under its revenue recognition policy, the third element – the second element is that shipment has been made and title and risk of loss has passed. When BlackBerry sells the devices to Verizon, they don't know when anyone goes back into a Verizon store and returns them. Verizon Wireless issues a statement saying that that is not true. So we've got a report about returns at Verizon outstripping sales, which I don't think it's possible that you can actually be returning more phones than have actually been sold. But we have Verizon saying it's not true. And then BlackBerry says in its press release that Verizon has refuted claims from research and investment firm Debt Weiler Fenton. There is nothing in – But we're here – doesn't it turn out to be true, actually? No, it's not true. If you actually go and you look at the court file in the Dunham prosecution, there is a sentencing submission by the government in which it says the information about sales and returns, quote, may not have been accurate with respect to the major smartphone manufacturers' overall sales and returns. But we're here on the grant of a motion to dismiss and the denial of a motion to reconsider, right? And so we're looking at just allegations of the complaint, in particular renewed and enhanced allegations based on developments reported in the press that appeared in the proposed amended complaint. And Judge Grisey denied the plaintiff's motion for leave to file an amended complaint and gave no reasons for that and didn't seem to – there was no indication that he believed the proposed amended complaint didn't succeed where the old one had failed or that it would be futile to amend or what have you. So why wasn't that an abusive discretion, given that there had at least been some factual development, the proposed amended complaint looked different? He gives no reason. We have a strong policy in favor of allowing amendment, even though some time had passed. We've allowed it after judgment in other cases. Maybe you can help me understand better why that's a defensible position. There certainly is a liberal policy in favor of amendment under Rule 15, but the liberality gets tempered once the judgment gets entered. What we're talking about is an amendment here that is made, a proposed amendment that's made in a reply brief in support of a Rule 59 motion. The proposed amended complaint is submitted more than 45 days after judgment and more than two months after that information became public, information that became public before the judgment was even entered. But again, what Judge Grisey said is there's – granted, he just denied it, but it's not an abusive discretion when the new information that is belatedly presented to him doesn't change anything about what BlackBerry said or knew. But he doesn't say that. He doesn't say it, I agree. But are we going to send it? Why shouldn't – well, we could send it back and say you need to take a look and explain if you think it's futile to allow leave to amend, for example. I think the court can look for itself, and it can see that this purportedly new information doesn't say anything about what BlackBerry knew. Again, on CENTER, they don't have a single confidential witness. I mean, there are thousands and thousands of employees that have left BlackBerry during this class period. They couldn't find one disgruntled employee to come up with any evidence to support it. There isn't a single internal document. All this is is an allegation of fraud by hindsight because it turned out that the device was not as well received as the company hoped it would be received at the beginning of the class period. Wayne, what about the Item 303, the trend reporting obligations, if they apply to a Canadian company? Well, they do not apply to BlackBerry. BlackBerry says in its annual report submitted on Form 40-F and in its quarterly filings on 6-K that it submits its filings pursuant to the United States-Canadian multi-jurisdictional disclosure rules, which are not the same as U.S. disclosure rules. So it doesn't apply. Number two, there is no known trend concerning sales of BlackBerry's new Z10 device. The annual report for 2013 covers the period through March 1 of 2013. The BlackBerry device is introduced in the U.K. and in Canada at the end of January and the beginning of February. It's not even available for sale in the United States until after that fiscal year has ended. It first becomes available, for example, on Verizon on March 28, actually the day of the earnings release for the prior year, and it's only for sale for a two-month period as of the time of the Q1 2014 report. So that's not long enough for BlackBerry to know of any trend. And, again, they have to show that the speaker actually knows what he's saying is not true and what does Mr. Hines, the CEO, say on the earnings call on June 28? He's quite specific that he doesn't know what it's going to turn out to be. He says, and this is in the joint appendix at 479 and 486, we are still early in our launch cycle and have yet to see all BlackBerry 10 products  It's a very volatile market, so many dynamics going on here. It's really, really hard to predict, even with a three-month outlook, where we're going to be. At what point does he say customers have embraced the product? He says that when the product is being rolled out and they're getting a lot of positive feedback about the new operating system. If you look in the tech press, there is a lot of positive feedback. If you look in the standard media reports about what is happening with sales, at the same time you've got the Dettweiler-Fenton report, you've got an article in the New York Times about how sales are up dramatically at Verizon. So there is a lot of positive comment. Again, all that BlackBerry knows is that it is shipping devices and the number of devices that are being activated. Of course, there's no surer way of creating a negative trend than for a producer of consumer products to come out with a statement saying, I guess the product sucks and everybody is returning it. One of the things that strikes me as peculiar about the plaintiff's contentions here is we're acting as if BlackBerry only addresses stock buyers when it's addressing device buyers. It seems to me quite remarkable to insist that companies take the most negative spin about their products for the sake of telling investors, oh, there may be a bad trend here in a way that would sink the product and the stock. Right. And this court's case law is quite clear that a corporate officer is not required to refrain from being optimistic about the prospects of his company's products. But at the same time, the company in its quarterly and annual filings has pages and pages of detailed risk factors saying we've had losses, we've had other devices that have not succeeded, we are in an intensely competitive market, current economic uncertainty may require us to reduce our prices, we may not be able to forecast correctly what our sales are going to be. They say all of these things. Again, let me go back to the Detweiler-Fenton report and the press release that came after it. I think the most telling evidence that there is no cienter at minimum is that BlackBerry says we are going to report this to the U.S. and the Canadian regulatory authorities. And what do we all think, what do we all know? The first question they're going to ask when you report that you believe that Detweiler-Fenton's report is false, they're going to say, why do you think it's false? And what they're going to do is they're going to share with them, as they said in their press release, the data that we have collected from our retail partners and carriers that show that the return rates are in line with our forecast. So there is absolutely no basis in this record to find cienter. And again, there isn't a single confidential witness, there isn't a single internal document that is cited anywhere in the complaint. All we have is a lawyer sitting at a keyboard and saying, with hindsight, that they should have known it at an earlier time period. Thank you, counsel. Mr. Brower, you're reserved three minutes for rebuttal. Yes, Your Honor. All right, first let me deal with the they're going to contact the SEC and the Canadian federal authorities. There's no evidence in the complaint or in the record or anywhere else. They ever did that. It makes a good press release, but who knows what they ever did. That's a new fact he decided to offer here that's not in the complaint, not sworn to, it's to be ignored as a matter of law. Similarly, the entire discussion about the trial and the pleas and the rest of it in the actual Denton trial, that's not in the record because all of that happened after all this briefing was closed. What happened in connection with those proceedings? What facts were reduced? And where they say they may have been incorrect, well, they may have been incorrect the other direction. They may have been incorrect by understating how badly BlackBerry was doing. The government just didn't put in the plea agreement what the exact numbers were. That's what discovery is for, not for defense lawyers to come to oral arguments on appellate motions, dealing with motions to dismiss and motions to amend and argue facts that don't exist anywhere in the world. Some of those arguments might have shown up in the district court if the motion had been made other than at the last moment in a reply brief on a motion to reconsider it. To be fair, Your Honor, with respect to the timing, what was required was to ask the court to undo the judgment. That's what SAIC says. I believe two of Your Honors were on that panel. That's the first step. You have to do it under Rules 59 or 60. That's not the same as saying there's new law. That had to do with showing there was new law. That's the standard, other than to throw away whatever justice allows. What we did was move with respect to the new law, which was Omnicare. Clearly, Judge Grasse relied on the wrong law. He relied on Fayette for almost every position he took in his opinion. Fayette was overruled by Omnicare, by the Supreme Court. When the defendants came back and said, that won't work, Omnicare, let's talk about Scienter, this, that, and the other thing, which they made a futility argument, not a failure to make a reconsideration motion correctly. They made the futility argument. We responded with new information that, by the way, was less than a month old when the court rendered its decision. The stuff came out about Detweiler and the Denton action no earlier than February 26th, and all of the information necessary to kind of put together a claim and pull together the little pieces of what happened there weren't available until March 26th, which is alleged in the proposed amended complaint. Well, that's after Judge Grasse already decided the motion, and it was a few days before we needed to move for reconsideration under Rule 59. So there was no time at that point, but what we did do is give the judge a proposed amended complaint. There are several cases by this court and by your honors where there was no proposed amended complaint provided to the district court so he could look at it and decide futility. There are cases where the court looked at issues that had arisen, like change in the law where you didn't have an opportunity for an adjudication on the merits so you could correct the defects that might be in your complaint, which was the situation here. There was no opportunity. There was one amended complaint that was looked at by the court. That amended complaint was the only one the court ever considered. It made its ruling, and we attempted to change that. And lovingly, the court said you're entitled. The whole point of Rule 15 is to allow you to fix defects in the complaint. That's what we're proposing to do here. We believe we have enough information, and indeed, I might add, last but not least, in Omnicare, the Supreme Court, after it changed the law and made it clear this is how you allege an opinion, it said we're not going to deal with this now. We're going to remand and send it back to the trial court where the complaint should be amended in order to take into account what we just ruled. The same should be true here where Judge Grisaille relied on Fayette and ignored the Omnicare decision. Thank you, Your Honor. Thank you, counsel. Thank you both. Very lively argument.